## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 31 2019, 8:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

T. Andrew Perkins
Peterson Waggoner & Perkins, LLP
Rochester, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship, C.S., Minor Child, | December 31, 2019 |
| A.S., Mother, | Court of Appeals Case No. 19A-JT-1727 |
| *Appellant-Respondent,* | Appeal from the Fulton Circuit Court |
| v. | The Honorable A. Christopher Lee, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 25C01-1901-JT-1 |
| *Appellee-Petitioner.* | |

**Brown, Judge.**

[1] A.S. ("Mother") appeals the involuntary termination of her parental rights to her child, C.S. We affirm.

### Facts and Procedural History

[2] In August 2010, Mother and her eleven-month-old child, C.T., tested positive for marijuana. C.T. was detained and, after a seven-month out-of-home child in need of services ("CHINS") period, C.T. and Mother were reunified. C.T. was again detained in May 2013, when Mother tested positive for methamphetamine. During the second ensuing out-of-home CHINS investigation, Mother failed to comply with the services and visitation, and C.T. was reunified with his father under a change of custody.

[3] In September 2015, Mother gave birth to S.K., who tested positive for THC and buprenorphine at birth. Mother refused a drug test, and S.K. was detained. After Mother tested positive for methamphetamine, an out-of-home CHINS matter was opened. Mother failed to comply with services, and S.K. was reunified with her father under a change of custody.

[4] In December 2016, Mother was arrested in Fulton County for possession of methamphetamine and unlawful possession of a syringe as level 6 felonies.

[5] Mother gave birth to another child, C.S. ("the Child"), on December 14, 2017. On December 15, 2017, the Fulton County Office of the Department of Child Services ("DCS") received allegations of suspicious activity and inadequate prenatal care. That same day, family case manager Susann Field ("FCM Field") visited Mother's hospital room in the obstetrics unit to investigate the allegations.

FCM Field encountered F.W., who was believed to be the Child's father, in the room with Mother. In plain view in the room, FCM Field observed a plastic bag that contained two small baggies of a green leafy substance that resembled marijuana; four small baggies of a white powdery substance; and a bag of ten hypodermic syringes. F.W. was arrested on drug charges.

[6] On or about December 15, 2017, Mother and F.W. tested positive for methamphetamine; Mother also tested positive for amphetamine and Oxycodone. The Child's meconium screen revealed the presence of methamphetamine, marijuana, and morphine. The Child was removed from Mother's care on an emergency basis on December 18, 2017. DCS placed the Child into foster care, where the Child has remained throughout the pendency of this action. That same day, DCS also filed a petition in which it alleged that the Child was a CHINS. During the Child's wardship, Mother was to participate in supervised visits. DCS referred Mother to Lifeline Youth and Family Services for supervised visitation, which was to occur in two-hour increments five times each week. From December 18 to December 27, 2017, Mother participated in only three of twelve scheduled visits and failed to follow instructions at the visits she attended. Of Mother's nine missed visits, she cancelled one visit and no-showed at the other eight visits. Lifeline discharged Mother for non-compliance.

[7] Mother also agreed to submit to random drug testing; however, with the exception of December 19, 2017, when Mother telephoned DCS to inquire about a drug screen, Mother did not willingly participate in drug screening

during the pendency of this action. DCS also referred Mother to Eric Foster, Incorporated, for a substance abuse assessment and a parenting assessment; however, Mother failed to contact Eric Foster, Incorporated, and the referral expired without her participation.

[8] After the Child was removed, Mother visited the Child three times and has not visited the Child since December 27, 2017. In the meantime, the Child has thrived in her foster placement.

[9] On January 28, 2018, Mother was arrested in Marshall County for dealing in methamphetamine as a level 4 felony. Mother refused to submit to a drug screen while she was in jail and indicated to the family case manager that she had used methamphetamine, "so there was no reason for her to submit to one." Transcript Volume II at 42. On February 15, 2018, Mother entered an admission that the Child was a CHINS; the trial court adjudicated the Child as a CHINS on February 18, 2018. Subsequently, the court entered a dispositional order, which required Mother to: (1) participate in supervised visitation; (2) refrain from illegal drug use or possession, call DCS daily, and submit to random drug testing upon request; (3) complete a substance abuse assessment; (4) undergo a parenting assessment; (5) participate in individual therapy and follow all recommendations; (6) participate in home-based case management services and follow all recommendations; and (7) legally establish the Child's paternity.

[10]     On March 2, 2018, Mother was released from the Marshall County Jail to community corrections. Mother did not contact DCS after she was released and did not participate in any services during that time. On April 23, 2018, Mother was arrested in Fulton County for possession of methamphetamine as a level 6 felony. On September 17, 2018, Mother pled guilty to the Fulton County offenses and was sentenced.

[11]     Following a periodic case review, the court found that Mother failed to: (1) comply with the case plan; (2) meet her parental obligations; (3) demonstrate progress regarding court-ordered services; (4) maintain contact with DCS from March 2 to April 23, 2018, when she was no longer incarcerated; and (5) participate in services. On January 2, 2019, DCS filed a petition to terminate Mother's parental rights. On March 20, 2019, DCS filed a notice of intent to admit drug screens at the evidentiary hearing on the petition to terminate Mother's parental rights.

[12]     The court conducted an evidentiary hearing on DCS's petition to terminate Mother's parental rights on May 24, 2019. At the time of the evidentiary hearing, Mother was incarcerated regarding the Marshall County offense. In its presentation of evidence, DCS introduced, and the court admitted, the results of Mother's failed drug test on December 15, 2017, following the Child's birth. Without objection from Mother, DCS introduced the drug test results under the business records exception to the rule against hearsay.

[13] On July 1, 2019, the court entered an order in which it terminated Mother's parental rights to the Child; it found that: (1) DCS proved, by clear and convincing evidence, that the Child has been removed from the home and the custody of the Mother for more than six (6) months pursuant to the terms of the dispositional decree; (2) "[t]he conditions that resulted in the child's removal and continued placement outside the home will not be remedied by the Mother"; (3) "continuation of the parent-child relationship between the Mother and Child poses a threat to the child's well-being"; (4) termination of parental rights is in the best interests of the Child; and (5) a satisfactory plan, adoption, existed for the care and treatment of the Child. Appellant's Appendix Volume II at 73.

## *Discussion*

[14] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

>> (D) that there is a satisfactory plan for the care and treatment of
>> the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence. Ind. Code § 31-37-14-2. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.* Reviewing whether the evidence "clearly and convincingly" supports the findings, or the findings "clearly and convincingly" support the judgment, is not a license to reweigh the evidence. *Id.* Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand and not set aside its findings or judgment unless clearly erroneous. *Id.* "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

To the extent Mother argues that the trial court abused its discretion when it admitted the results of Mother's failed drug screen on December 15, 2017 as a business record she admits that she did not object to the admission of the drug screen results. Thus, this issue is waived. *See Cavens v. Zaberdac*, 849 N.E.2d 526, 533 (Ind. 2006) ("In order to properly preserve an issue on appeal, a party must, at a minimum, 'show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal.'") (quoting *Endres v. Ind. State Police*, 809 N.E.2d 320, 322 (Ind. 2004)).

Mother argues that, in concluding that the conditions that led to the Child's removal would not be remedied, the court improperly relied on the fact that "no one knew exactly when [Mother] would be released from the Marshall County Jail . . . and available for services" and improperly "shift[ed] the burden of proof" to Mother. Appellant's Brief at 13.

In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history

more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[18] To the extent Mother does not challenge certain findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[19] In its order terminating Mother's parental rights to the Child, the court made the following findings:

> (B) The Court recognizes Mother has been incarcerated for most of this case and therefore has been unable to participate in court ordered services. Case law is clear that incarceration alone cannot serve as a basis for termination of parental rights. *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 643 (Ind. 2015). At the same

time, this Court cannot ignore Mother's habitual pattern of substance abuse and exposing her children to illegal substances. Mother has two other children which were adjudicated CHINS. Both cases were initiated based on Mother's substance use. In both cases, the child involved also tested positive for illegal substances. In both prior CHINS cases the children were placed with their respective fathers because Mother was unable to comply sufficiently to support reunification.

(C) This child was also drug exposed – like [M]other's other two children. [M]other was given an opportunity to engage in services just after detention in December 2017 until her arrest in January, 2018 but failed to substantially comply with services or even visitation with her newborn child. Mother was released on community corrections from March 2, 2018 until her arrest for Possession of Methamphetamine on April 23, 2018. During this time [M]other did not even attempt to contact DCS to engage in services or see her child.

(D) The Mother is currently incarcerated and it is unknown when she will be released and available to attempt services. Any chance of reunification is distant and unlikely given the Mother's criminal difficulties coupled with her long-standing history of substance abuse.

Appellant's Appendix Volume II at 115-116.

[20] Mother mischaracterizes the court's reliance on her incarceration in finding that a reasonable probability existed that the conditions that led to the Child's removal would not be remedied. Mother correctly states, and the court properly found, that incarceration alone cannot serve as a basis for termination of parental rights. It is well-settled, however, that a trial court may evaluate the parent's habitual patterns of conduct to assess the likelihood that the child could

experience future neglect or deprivation; and give considerable weight to the parent's history of incarceration and the effects upon the child. *See A.D.S. v. Ind. Dep't of Child Services*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (holding that the parent's habitual patterns of conduct should be evaluated to determine the probability of future neglect or deprivation of the child, that DCS is not required to prove a parent has no possibility of changing; and that DCS need only establish a reasonable probability that no change will occur), *trans. denied*. Here, we find that the trial court evaluated Mother's habitual patterns of conduct and history of incarceration and noted the frequency, duration, and extent of her incarcerations and the impact on the Child and ultimately concluded that any chance of reunification is distant and unlikely.

[21] The record reveals that Mother faced pending drug charges at the outset of this action and that, since the Child's removal, she was arrested and incarcerated for multiple drug crimes and pled guilty to dealing in methamphetamine and possession of methamphetamine. At the time of the evidentiary hearing in this case, Mother was incarcerated and had an unknown release date. The record further reveals that Mother used methamphetamine until she discovered she was pregnant with the Child, which was four-and-one-half months into the pregnancy; the Child's meconium tested positive for methamphetamine, marijuana, and morphine; Mother failed to participate in court-ordered substance abuse assessments and random drug screens when she was not incarcerated; Mother refused a drug test in jail and indicated to the family case manager that

she had used methamphetamine; and Mother's two children, born prior to the Child, were born drug-exposed and ultimately removed from her care.

[22] Although we observe Mother's efforts following her April 23, 2018 arrest to seek out substance abuse counseling,[1] we note that the trial court is given discretion in balancing her efforts at improvement prior to termination against the habitual patterns of her conduct and in determining that the evidence of Mother's prior history is the best predictor of her future behavior. *See K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1234 (Ind. 2013) ("Further, the trial court was within its discretion to 'disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts.'"). In light of the unchallenged findings and evidence laid out above and in the record, we cannot say that the trial court clearly erred in finding that a reasonable probability exists that the conditions resulting in the Child's removal or the reasons for placement outside Mother's care will not be remedied.

[23] We find no error and affirm the termination of Mother's parental rights.

[24] Affirmed.

Altice, J., concurs.

---

[1] Mother points to her testimony that she asked for individual substance abuse counseling in Marshall County Jail and that she "obtained to the NA class weekly" and went to the Celebrate Recovery class weekly. Transcript Volume II at 104.

Tavitas, J., concurs with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: C.S. (Minor Child),

and

A.S. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 31, 2019

Court of Appeals Case No. 19A-JT-1727

Appeal from the Fulton Circuit Court

The Honorable Christopher Lee, Judge

Trial Court Cause No. 25C01-1901-JT-1

**Tavitas, Judge, concurring.**

[25] I concur with the majority. Respectfully, I write separately regarding the merits of Mother's challenge to the admissibility of her drug screen results pursuant to Indiana Evidence Rule 803, the business records exception to hearsay. Although this issue is waived for Mother's failure to properly preserve the issue for appeal, I write to highlight the current split on this Court regarding whether admission of drug test results, as occurred here, falls within the business records exception to the rule against hearsay. *See Matter of L.S.*, 125 N.E.3d 628, 634 (Ind. Ct. App. 2019) (" . . . [The drug test results] were inadmissible as hearsay and should not have been admitted . . . ."); *see In re K.R.*, 133 N.E.3d 754, 762

(Ind. Ct. App. 2019) ("[W]e conclude that drug test results do indeed fit into the business records exception to the hearsay rule.").

[26] During DCS's investigation, Mother submitted to an oral fluid screen. At the fact-finding hearing on DCS's petition to terminate Mother's parental rights, Mother's drug test results were admitted as a certified business record. DCS tendered an affidavit from Forensic Fluids Laboratories, Inc.'s ("FFL") laboratory director detailing FFL's drug testing procedure; introduced the report of the drug test; and submitted FFL's certification of business records. Additionally, DCS presented witness testimony that described the manner in which DCS obtained and secured Mother's fluid sample; detailed the process that DCS typically employs for obtaining all drug screen samples; and attested that DCS's typical process was used to obtain Mother's drug screen sample.

[27] Mother maintains that the drug screen results constituted inadmissible hearsay; I disagree. In *K.R.*, a panel of this Court considered whether a trial court abused its discretion when it admitted the appellant-parents' drug test results, as reported by Forensic Fluids Laboratories, Inc. ("FFL"), pursuant to the business records exception to the rule against hearsay. The panel considered the following in analyzing the issue:

> Evid. R. 803(6) provides that such records are admissible if:
>
> > (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) [the rule on self-authentication] or with a statute permitting certification; and

(E) neither the source of the information nor the method or circumstances of preparation indicated a lack of trustworthiness.

This hearsay exception is grounded on the theory that records of regularly conducted activity are reliable because they can be checked systematically.

The Indiana Supreme Court has explained as follows regarding this rule:

The business records exception to the hearsay rule is based on the fact that the circumstances of preparation assure the accuracy and reliability of the entries. As we have observed more recently, the reliability of business records stems in part from the fact that the organization depends on them to operate, from the sense that they are subject to review, audit, or internal checks, [and] from the precision engendered by the repetition[.]

In essence, the basis for the business records exception is that reliability is assured because the maker of the record relies on the record in the ordinary course of business activities. The 'regular course' of business 'must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business.' Thus where a company does not rely upon certain records for the performance of its function those records are not business records within the meaning of the exception to the hearsay rule[.] It is not enough to qualify under the business records exception to show that the records are made regularly, rather, the court must also look to 'the character of the records and their earmarks of reliability acquired from their source and origin and the nature of the compilation.'

*K.R.*, 133 N.E.3d at 760-61 (citations omitted). In rejecting the parents' argument that the drug test results did not fit within the business records exception to the hearsay rule, the *K.R.* panel distinguished the circumstances surrounding the admission of the parents' drug test results from the circumstances surrounding the admission of a social services agency's reports in *Termination of Parent-Child Relationship of E.T.*, 808 N.E.2d 639, 642-43 (Ind. 2004).

[28]     In *E.T.*, our Supreme Court found that reports generated by nonprofit SCAN, Inc., a social services agency, did not qualify as business records within the meaning of the business records exception. The reports, which described the agency's impressions following home visits and supervised visits, "included third-party statements concerning events not observed by [SCAN's] staff

members" and "conclusory lay opinions"; "appeared to have been compiled for the sole benefit of DCS," which was also SCAN's sole source of referrals; and did not appear to "ha[ve] been prepared for the systematic conduct of [SCAN]." *K.R.*, 133 N.E.3d at 761 (citing *E.T.*, 808 N.E.2d at 642-43).

[29] The *K.R.* panel contrasted the SCAN reports in *E.T.*, which lacked certain inherent indicia of reliability, with FFL's protocols as follows:

> Specifically, [FFL] functions independently from any law enforcement body or state agency. Rather, its services are presumably available to any person, public or private, corporate or individual, who wishes to pay the lab fees. In addition, the chemical analyses performed at [FFL] appear to be routine procedures, done for whomever requests them. These facts distinguish the SCAN reports [i]n *E.T.* from the drug test results in [*K.R.*] . . . . Accordingly, we conclude that drug test results do indeed fit into the business records exception to the hearsay rule.

*Id*. at 762.

[30] I agree fully with the *K.R.* panel's reasoning. Waiver notwithstanding, the trial court did not abuse its discretion when it admitted Mother's drug test results, pursuant to the business records exception to hearsay, because the drug test results meet the requirements of Indiana Evidence Rule 803.